1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )
                                    )
        vs.                         )   No. 09 CR 181
                                    )
ANTHONY A. DEMASI,                  )   Chicago, Illinois
                                    )   July 2, 2010
                Defendant.          )   11:08 o'clock a.m.

TRANSCRIPT OF PROCEEDINGS -
Sentencing
BEFORE THE HONORABLE REBECCA R. PALLMEYER

APPEARANCES:

For the Plaintiff:      HON. PATRICK J. FITZGERALD
                        United States Attorney
                        219 South Dearborn Street, Suite 500
                        Chicago, Illinois  60604
                        (312) 353-5300
                        BY:  MS. APRIL PERRY

For the Defendant:      STETLER & DUFFY, LTD.
                        BY:  MR. MARK L. ROTERT
                        11 South LaSalle Street
                        Suite 1200
                        Chicago, Illinois  60603
                        (312) 338-0214

U.S. Probation:         Ms. Melissa Ray

COLLEEN M. CONWAY, CSR, RMR, CRR
Official Court Reporter
219 South Dearborn Street, Room 2524-A
Chicago, Illinois  60604
(312) 435-5594
*colleen_conway@ilnd.uscourts.gov*

1          (Proceedings in open court.)

2                  THE CLERK:  09 Criminal 181-1, U.S.A. versus Demasi.

3                  MS. PERRY:  Good morning, Judge.

4          April Perry on behalf of the United States.

5                  THE COURT:  Good morning.

6                  MR. ROTERT:  Good morning, Your Honor.

7          Mark Rotert on behalf of the defendant, Anthony

8   Demasi, and Mr. Demasi is present in court.

9                  THE COURT:  Good morning.

10                 THE DEFENDANT:  Good morning, Your Honor.

11                 THE COURT:  All right.  We are here for sentencing.

12  Is everybody ready to proceed?

13                 MS. PERRY:  I believe so, Judge.

14                 MR. ROTERT:  We are, Your Honor.

15                 THE COURT:  All right.  And, Mr. Demasi, you and your

16  attorney have had a chance to review the presentence report,

17  correct?

18                 THE DEFENDANT:  Yes, we have.

19                 THE COURT:  All right.  Let's begin with the report

20  and calculations made by the probation officer.

21          And is the probation officer with us?  I am not sure.

22                 MR. ROTERT:  Your Honor, the probation officer sent

23  an e-mail to, I believe, counsel for the government and myself

24  saying that he was on leave, but that there was another person

25  from the Probation Office, whose name I can't recall, who was

1    going to participate on his behalf, and it now occurs to me,

2    Judge, that we didn't notify that person that we were --

3              THE COURT:  Of the change?

4              MR. ROTERT:  -- changing it to 11:00.

5              THE COURT:  You know what?  If you could give me the

6    name, we'll call him or her and just let them know.

7              MR. ROTERT:  I would love to do that, Judge, but it's

8    on my e-mail system at the office.  I can call.  I'm not --

9              THE COURT:  That's all right.  We'll go ahead and

10   proceed.

11             MS. PERRY:  Sorry, Judge.

12             MR. ROTERT:  I apologize, Your Honor.

13             MS. PERRY:  I forgot about that as well.

14             THE COURT:  That's all right.  We'll proceed.

15             In any case, we need to begin with the probation

16   officer's report.

17             The probation officer has prepared a substantial

18   report and has developed some determinations regarding the

19   guidelines calculations that we should discuss.

20             Those findings support a total offense level of 28

21   and a criminal history category of I.  And what are the

22   parties' views about that calculation?

23             MS. PERRY:  Judge, the government believes that is

24   the appropriate calculation.

25             MR. ROTERT:  Your Honor, the defense concedes that on

1  the literal application of the guidelines manual, those

2  applications are correct.

3        THE COURT:  All right.  And that gives us a guideline

4  range of 78 to 87 months.

5        MS. PERRY:  And, Judge, actually, it is 97 months.

6  There is a correction that needs to be made on page 21, line

7  529.  The offense level is correct, the category is correct,

8  but it just should be 78 to 97.

9        THE COURT:  You know what?  I think that's right.  I

10  am just going to double-check, though.  I've actually got my

11  chart right here.  Yes, it is 78 to 97 months, that's correct.

12        All right.  Then let's talk about what sentence is

13  appropriate.  I am going to begin with the government and then

14  I will hear from you, Mr. Rotert.  And, Mr. Demasi, you are

15  also welcome to make a statement, if you wish to do so.

16        MR. ROTERT:  Thank you, Your Honor.

17        MS. PERRY:  Judge, the government does believe a

18  sentence within the guidelines range is appropriate in this

19  case, and there's kind of a lot of issues on the table.  And I

20  apologize for getting you the e-mail that I sent up late.

21        THE COURT:  I just saw those.  Yes, I have those.

22        MS. PERRY:  Okay.  I unfortunately was on trial for

23  the last six weeks, so I just started digging out after that.

24  And I gave it to Mr. Rotert, and he and I have talked through

25  that, and Your Honor has it before you.

1          THE COURT:  Uh-huh, uh-huh.

2          MS. PERRY:  First of all, let me start with Mr.

3    Demasi's cooperation, which is outlined more fully in the

4    government's version.  And we laid out everything he did there,

5    and we also laid out the fact that it didn't and hasn't led to

6    any prosecutions, and that's for a number of reasons that I'll

7    discuss more in a minute.

8          But, first, I'd like to address the SEC issue, which

9    Mr. Rotert raised in his most recent filing.

10          I called the individual who was in charge of that

11    investigation -- his name is Vince Martinez -- and I spoke with

12    him about whether or not he felt that Mr. Demasi had aided in

13    that investigation, and he told me that he did not believe that

14    that was the case.

15          He said that Mr. Demasi had called him on several

16    occasions, but that, frankly, in his opinion, he was not

17    providing information as much as trying to seek out

18    information, and that he did not consider him to be an integral

19    part in making that particular case.

20          So, at least in the opinion of the SEC, that should

21    not be considered as cooperation or as substantial assistance.

22          What the government really believes the big issue

23    here was was Mr. Demasi's post-cooperation and, during his

24    cooperation, his conduct.  And we lay out a couple of things in

25    the government's version that we believe made him unusable as a

1   witness, and I know that Mr. Rotert has taken exception to
2   that.
3           But while he was supposedly cooperating with the
4   government, he was having a lot troubles with a girlfriend
5   which resulted in him getting a criminal conviction, criminal
6   damage to property, which was from him punching her car.  And
7   say what you will about whether or not that consists of
8   domestic violence, but that is obviously not the kind of
9   behavior that the government is hoping to see in people who are
10  cooperating.
11          In addition to that, there are three checks that he
12  attempted to cash in November of 2008 totaling $39,000.  And,
13  you know, the sentencing memo that the defendant submitted
14  gives a lot of different reasons for that, but the fact of the
15  matter is this is three checks totaling $39,000 that defendant
16  had no reason to believe he was entitled to.
17          With respect to the first, which was written on his
18  own father's account, I know that some suggestion has been
19  made, of course, he wouldn't try to steal from his father, but
20  when he was interviewed by Chase Bank investigators, he
21  admitted that he was not entitled to that money and that he had
22  called his father's assistant and was trying to get that money
23  from her, even though he had never been authorized to do so,
24  and then the assistant went ahead and sent a check that he
25  attempted to cash, for which there was not enough money in the

1    account.

2              There's two other checks that are similar in type,

3    money he flat out was not entitled to.  This isn't a $50

4    grocery overwriting check.  These are checks in the amount of

5    8,000, 9,000 dollars on accounts that were long ago closed or

6    that were never his in the first place.

7              And the government does feel that that's continuing

8    acts of fraud at a time when he was, again, supposed to be

9    cooperating.

10             Now, Mr. Rotert put in his memo a couple of people

11   who he feels should be charged based upon the defendant's

12   cooperation, and the problem with this, from the government's

13   perspective, is all of this comes from Mr. Demasi.  These

14   charges would be based solely on his word, documents he

15   provided, and, in one case, a recording that he made illegally

16   on his own.  The recording itself is not of the type of quality

17   that one would hope for.

18             And I guess, suffice it to say, the government does

19   not charge individuals based on one source.  Items have to be

20   corroborated, and they have to be corroborated from independent

21   sources, before charges can be brought.  We can't charge people

22   simply because someone has worked very hard and they think that

23   they've made a good case.  If we can't corroborate it

24   independently, other charges can't be brought.

25             So the government has worked in good faith here.  We

1    have done the best we can, as Mr. Demasi has in certain

2    circumstances.  He has cooperated and has attempted to make a

3    case.  Unfortunately, we can't depend on just one person,

4    especially when that person has had some of the credibility

5    problems while they were cooperating and since they've been

6    cooperating.

7          For example, Mr. Rotert points to a letter of

8    understanding that he says proves that these cases could have

9    been made.  The government asked for that document or a

10   document like that for years, and the first time that that

11   document appears is about two weeks before he's set to be

12   sentenced.

13         For all of these reasons, we don't feel like charges

14   should be brought against any other person or can be brought

15   against any other person, and, therefore, we don't feel like

16   this has been substantial assistance.

17         With respect to the 3553(a) factors, Judge, this

18   defendant has had really everything in life provided to him.

19   He comes from a supportive family.  He had an excellent

20   upbringing.  He had none of the type of economic depravation or

21   abuse or trauma that you often see in defendants who are

22   brought before you.  He is highly educated.  He is highly

23   intelligent.  And, just generally, you can tell from the PSR as

24   well as letters that he had every chance for legitimate success

25   in life.  Everything he needed was provided to him, and he

1    really could have gone places in a legal and legitimate way,
2    and, instead, he chose not to.

3            With respect to the seriousness of the offense,
4    Judge, there are a couple of things that I want to talk about
5    here.

6            Obviously, this is a very serious offense.  You have
7    seen some of the victim impact statements in the PSR itself.
8    The defendant took from people what would have been their
9    living expenses, what would have been their savings, and for
10   some people, what would have been their retirement income.  He
11   stole all that from people who were, in many cases, his close
12   friends, people who trusted him, people who relied on him to be
13   honest.  This caused people not only monetary harm, which some
14   of them have described to you, but also, of course, emotional
15   harm, and some of the victims have recounted the amount of
16   counseling and medications that have -- they have needed to
17   expend based upon the stress and emotional harm that this has
18   caused them.

19           Now, Mr. Rotert talks about two other individuals who
20   did the trading in this case.  And he states that the defendant
21   relied on others to conduct all of his trading activities in
22   terms of mitigating the offense, and that is not a mitigating
23   factor here.  He may have relied on other people to physically
24   make the trades, but the problem is he was controlling the
25   purse strings.  Out of the $4.7 million that was given to him

1    to trade, he only gave one million of that, a little bit less

2    than one million to those people who were trading the funds.

3         So there is a lot of discussion about how those

4    people weren't doing what they should be doing with the money,

5    but the bigger problem is that out of the 4.7 million he was

6    given to trade, it never even got to those people to be

7    invested.  So say what you will about what was happening with

8    the Black Box trading program and everything else, more than

9    three million of that money was completely diverted, never even

10   got to them because of the defendant's conduct.

11        He was the one who had the sole signatory power over

12   that account.  He's the one who decided not to give the money

13   to the people to trade in the first place.

14        Additionally to that, after August of '06, there was

15   no trading on those accounts at all.  He didn't provide any

16   money at all to those people who were supposed to be trading

17   it, and he kept generating these false statements, indicating

18   that not only had people's money been submitted, but that it

19   was doing well.

20        So this is not just a matter of the defendant naively

21   trusting someone else to do what they should be doing with the

22   money.  He himself was not even passing the money along.  He

23   was diverting it for his own purposes.

24        Above and beyond that, Judge, every single quarter

25   that money was invested, the very little that was, except for

1    one, was completely unprofitable.

2            The defendant argues in his sentencing memorandum

3    that he was just very naive and hoping very much that it would

4    turn around.  The fact of the matter is it never was

5    profitable.  There was no reason for him to believe, ever, that

6    the very little money he was giving to these people was ever

7    going to generate any income.

8            With respect to the loss amount, Judge, there was a

9    loss in this case of over $3 million.  That, as I said,

10   represented people's well-earned and hard-earned money, and it

11   was a devastating loss to them.

12           Now, the defendant in his sentencing memo quibbles a

13   little bit about that, does the simple math of if 4.7 million

14   was given to him and I believe it was 1.9 million was paid out,

15   then how could there possibly be a loss of over $3 million?

16           Well, it's not simple math, because the defendant was

17   running a pyramid scheme.  Some people were being overpaid the

18   amounts of their investments.  You can't just subtract the

19   amount that he received and the amount that he paid out to get

20   the amount of loss because we have people who were being paid

21   far more than they ever put in, who are getting -- then

22   generating more investors for other people along down the line.

23   That's why the loss amount in this case is the $3,151,341.

24           Judge, finally, I'd like to address the risk of

25   recidivism in this case.  And the defendant's psychiatrist has

1    hypothesized, in what I'm sure is not a medical term, that the

2    risk of recidivism is, and I quote, like nil.  I don't know

3    what he bases that on, but the government feels that the risk

4    of recidivism in this case is very high.

5            And for that, we've submitted to you this e-mail

6    which shows a few things that are very important here.

7            First of all, the defendant is or has been, while on

8    this own Court's bond, engaging in illegal sports betting.

9    That's what this e-mail is discussing.

10           If you go to the first tab, he talks about how he is

11   going to be picking the winners and losers for games that he is

12   going to bet on, and splitting the proceeds or the losses with

13   another person 50/50, and that person is the person who is

14   supposed to be setting up the site so that it is in that

15   person's name rather than his.

16           Above and beyond, though, just to the illegal sports

17   betting, if you flip to the second page after the first tab, he

18   is making the same representations that he made as part of his

19   CFTC fraud scheme.  He tells this person that he is developing

20   a program which will basically eliminate the risk of loss from

21   sports betting; that they can make together 500 to 3,000

22   dollars per week, and that they will make even that much when

23   they're in a losing week.

24           He's got this sophisticated get-rich-quick scheme

25   again that he's trying to sell people on as being a sure thing,

1   to win on illegal sports betting, and that right there, we

2   think, Judge, shows that he is at a very high risk of

3   recidivating.

4           He has a lot of talents, as is clear from the

5   character letters submitted on his behalf, he has a lot of

6   ambition, as is also clear from those character reference

7   letters, and, unfortunately, he continues to use both of those

8   very good attributes to engage in illegal behavior and

9   dangerous behavior and fraudulent-type behavior.

10          Judge, another thing that's clear from these e-mails,

11  if you flip to the second tab, you know, he had a psychiatrist

12  write a letter on his behalf and talk about all of the

13  different medications he's on, one of which is Adderall, and I

14  think it's clear from this exchange of e-mails that that

15  Adderall is not being used for its appropriate purpose.

16  Instead, he's using that more in a club-drug sense.  He's

17  giving out his prescription drugs to his friends.

18          And the e-mail is pretty clear about that.  And this

19  is yet another example of how he is manipulating what he has

20  and what he has been given to his own benefit.

21          Judge, in addition to all of this, the defendant has

22  already been subjected to a $10 million judgment in which he's

23  been ordered to repay the victims of his various conduct.

24  Three million of that is for this offense, and the rest is for

25  related-type incidents that the CFTC got involved in.

1    I think his conduct over the past year since that
2  judgment has been entered is very telling about what is
3  important to him.  Although he has a $10 million judgment
4  against him, he is living in Trump International Towers.
5  Although he has a $10 million judgment against him, he is
6  sitting on nearly $20,000 in jewelry and an art collection.
7  Although he has a $10 million judgment against him, he is
8  throwing lavish parties for people.  One of the character
9  reference letters talks about this incredibly extravagant party
10  that he threw for some children's birthday parties, which is
11  nice, but the problem is he has a $10 million judgment against
12  him.  He is reporting massive amounts of excess income every
13  month that needs to be going to the victims, and, instead, it's
14  being used to fuel his very lavish lifestyle and this type of
15  gambling.
16    He talks in this e-mail about having $200,000 to
17  spend on gambling.  And, Judge, if you look at all of -- not
18  only the judgment against him, but the amount in student loans
19  and everything else, it is clear he is not taking this
20  seriously.  This is a serious offense.  He is continuing to
21  engage in illegal conduct.  And, simply put, he needs to
22  understand how important this is, how significant this is.  He
23  cannot just roll his way out of this one like he continues to
24  do with so many other things.
25    His victims have suffered a tremendous amount.  They

1    deserve to be repaid, and they do deserve to have some kind of

2    just punishment brought to bear here.

3            For all of those reasons, the government feels that a

4    sentence of imprisonment is important in this case.

5            And yes, we do feel like the cooperation that he has

6    given is a mitigating factor, absolutely, but at the same time,

7    he has a lot of aggravating factors in the past few months and

8    years that should be addressed as well.

9            If there are no other questions --

10           THE COURT:  No.  Thank you, Ms. Perry.  I appreciate

11   that.

12           Mr. Rotert?

13           MR. ROTERT:  Thank you, Your Honor.

14           First of all, I want to express to the Court Mr.

15   Demasi's gratitude and my own.  We've burdened the Court with

16   an unusually, I think, large amount of paper in this case, but

17   clearly -- and I know the Court understands -- we felt that it

18   was important, under the circumstances, with very little

19   factual record for the Court to work from, that we tried to get

20   as much information before the Court as possible for purposes

21   of sentencing.

22           And I want to just address a few things that the

23   government has brought to your attention and then produce some

24   of my own remarks.

25           Your Honor, on the SEC issue, I can't account for

1    what Mr. Martinez in Washington said.

2              I do know, and I don't think the government would

3    dispute, that Mr. Demasi came forward and told me that he had

4    information about what looked like an illicit scheme.  I

5    contacted the government, and the agent who's assigned to this

6    case met with Mr. Demasi and me and an SEC enforcement attorney

7    from Salt Lake City, who flew in for the purpose of meeting

8    with Mr. Demasi.

9              Now, as the Court knows, the SEC isn't always very

10   forthcoming in terms of what they know or what their existing

11   cases look like, but I can tell you that having sat through the

12   interview of Mr. Demasi that that SEC lawyer conducted, I have

13   every reason to believe that the SEC had never heard of this

14   Mr. Nelson before Mr. Demasi brought this person's name to

15   their attention.  Mr. Demasi produced -- not only sat through

16   an interview, but produced records that he was able to obtain

17   that corroborated the things he said in the interview.

18             He didn't say that he had been doing business with

19   these people, but that he had encountered them in connection

20   his current job.  And as he looked at the offers they were

21   making, they looked illicit to him.  And now the SEC has filed

22   an enforcement action against Mr. Nelson and other individuals

23   in Salt Lake City.

24             I haven't spoken with Mr. Martinez since -- I haven't

25   spoken with him this week, but I must say that I'm disappointed

1   and surprised to hear that he ascribes to Mr. Demasi no credit

2   for what was done, because I have a pretty good trail of

3   information and experience with the SEC enforcement lawyer out

4   of Salt Lake City that is to the contrary.

5          So on the SEC point, Your Honor, if that were the

6   only cooperation that Mr. Demasi had made an effort to provide,

7   I suppose that the question of what cooperation he actually

8   provided might be more decisive.  But I think that, even if

9   begrudgingly, the United States concedes that Mr. Demasi has

10  done everything that he possibly can that he's ever been asked

11  to do.  He has met with the FBI.  He has met with the IRS.  He

12  has met with the City Inspector General.  He's met with state

13  investigative officials.

14         In the course of the time that Mr. Demasi has been

15  involved in this case, he has worked with a succession of three

16  Assistant United States Attorneys.  The first one worked with

17  Mr. Demasi, they elicited a whole bunch of information, there

18  was a good relationship going, and then that individual left to

19  the greener pastures of private practice.

20         We got another Assistant.  Mr. Demasi worked with

21  that person, made all sorts of meetings, wore wires,

22  participated in all kinds of undercover meetings, brought

23  forward information.  This wasn't just a process where the

24  government said:  We know you dealt with A, B, or C.  What do

25  you know about those people?  Mr. Demasi brought in the names

of people or circumstances of misconduct that, as far as we know, previously were not known by the government. And when the people would come in, they would get a chance to talk to him for as long as they wished. He never said, "No." He never said, "I'm too busy." He never said, "Gee, I don't know. Wearing a wire in that environment to meet with those people is just something I don't think I've got any interest in." He never said that. He was, at all points, and as to all requests, forthcoming, diligent, responsive. He did everything he could.

Now, Judge, in this context, I want to talk about the elephant in the room. I don't know if the Court has had the chance to see the morning papers. One of the issues that's related to this case, in candor, is that Mr. Demasi clearly is a person who's made some decisions that he should have made differently.

One of those decisions he made early on, before he had the dubious pleasure of my acquaintance, because he went and met with a columnist for one of our local papers, and he told that person that he was, by gosh, going to tell everything he knew about corruption and misconduct and illegal conduct that he'd experienced.

Well, that columnist did what you would predict. He ran a story, assuring the world that Mr. Demasi was going to provide that kind of information, and, as you would understand,

1    that had a pretty negative impact on Mr. Demasi's ability to
2    effectively function.

3         So I will concede that he was, therefore, relegated
4    to try and provide as much historic cooperation as he could,
5    but, Your Honor, hours and hours and hours, over days and weeks
6    and months, Mr. Demasi set aside any and other -- any and all
7    other responsibilities to sit with the government and their
8    agents and work.  From all forms of law enforcement, for all
9    purposes, he never shaded or distorted or walked away from his
10   own participation in misconduct.  He never tried to shift blame
11   in a way that wasn't realistic.

12        I think that the government tacitly acknowledges that
13   Mr. Demasi did everything he possibly could.  I think that, to
14   some degree, the cases that I'm familiar with, about which Mr.
15   Demasi spoke, are not necessarily susceptible to an easy or
16   quick resolution.  Maybe all he did was put a few more bricks
17   in the wall, but those are efforts that are relevant to the
18   Court's determinations under 3553.

19        And I think that it's important to understand why he
20   did those things.  He was doing those things and talking about
21   doing those things because he realized that he had been in a
22   group of people that were bad and evil people, and that he was
23   behaving in a bad and evil way, and he wanted to break himself
24   free of that, and he wanted to make sure that he could atone
25   for some of his own misconduct by trying to see to it that

1    other people that were engaged in misconduct would have to
2    confront those realities.

3          So it isn't just about the SEC and whether one lawyer
4    in Washington may or may not hold the opinion of another lawyer
5    in Salt Lake City.  It's about efforts over months of time.
6    Mr. Demasi has done everything that he's ever been asked, and
7    tried to do even more than the government sometimes seemed to
8    be interesting in hearing about.

9          So the government says that he was unusable as a
10   witness.  I know that the Court's read my position paper.
11   There's plenty of cooperating witnesses who come on the stand
12   with what we refer to colloquially as baggage.  Mr. Demasi has
13   baggage, but he's also got information that I think is
14   corroborative and helpful.

15         I also want to address the comment made about his
16   girlfriend -- or his former girlfriend.  Clearly, that wasn't a
17   very happy relationship.  And yes, Mr. Demasi did get convicted
18   of criminal damage to property.

19         I have to reject and ask the Court to reject any
20   analogy to domestic violence.  I can tell you, Your Honor, that
21   I have absolutely no evidence or information or reason to
22   believe that Tony Demasi has ever been physically aggressive or
23   violent towards any man, woman, or child.  The notion that he
24   was any form of physical threat to this young lady is simply
25   not sustainable.

1           And, Judge, the circumstances under which he punched

2    the dashboard of her car were that she insisted on driving home

3    from a nightclub when he was convinced that she was too drunk

4    to drive.  And when he reached over to try and turn off the

5    ignition and she started to resist that, he expressed his anger

6    by punching the dashboard in front of him.  For that, he was

7    arrested for criminal damage to property.  And in a situation

8    that I find incomprehensible, he actually wound up spending

9    weeks in the Cook County Jail on that charge.

10          So, Judge, it's not a situation involving a person

11   with violent tendencies.  That is absolutely unsustained on the

12   evidence before the Court.

13          Your Honor, I know also that the Court noted the

14   comments that I made about other individuals.  Again,

15   respectfully, I have to disagree with the government's

16   assertion that Mr. Demasi was the only witness against these

17   individuals.

18          When the government gave me the Rule 16 materials in

19   Mr. Demasi's case, they, of course, included 302 interviews of

20   individuals who gave money for investment in one of the Tsunami

21   enterprises.  Time and time again, including people who are the

22   subject of counts of the indictment against Mr. Demasi, people

23   say that one of the individuals I name in my papers was the

24   person who approached them.  One of the people whom I name in

25   my papers was the one who told them about these outlandish

1  profits, that they decided to invest on the basis of what that
2  individual told them, and only then were they introduced to Mr.
3  Demasi.

4      So the notion that it's Tony's word against theirs,
5  frankly, is unsupported and is impeached by the government's
6  discovery in this case.

7      With regard to the other individual whom I name, I
8  must tell you, Your Honor, the government said, "Well, we've
9  been looking for that document for years."  Well, so were we,
10 and Mr. Demasi found it in a box of records that he was moving
11 from storage.  He hadn't any idea that it was there.  It was
12 clearly to his advantage to produce that to the government.  He
13 had absolutely no incentive to withhold it and every reason to
14 bring it forward.

15     But the point is that as soon as it was brought
16 forward, I sent it to the United States and I said, "I think
17 this is a pretty significant document that could push you over
18 the edge in terms of making the right choice in charging this
19 individual."  I got no response until Ms. Perry was kind
20 enough, after getting through a very lengthy and successful
21 trial, that she finally called and said, "Well, we're not going
22 to do that."  That's the response I got.

23     The fact is you know, Your Honor, that Illinois law
24 precludes or forbids the taping of a conversation without the
25 consent of both parties.  Tony, we've always acknowledged,

1   violated that principle, but he taped this particular

2   individual.  And on tape, this individual admits, "Oh, yeah, I

3   lied to the CFTC.  I didn't tell them the truth.  I didn't want

4   them to know the real story about our relationship.  And, by

5   the way, I didn't produce all the documents they subpoenaed

6   either."

7           So Your Court -- the Court's also familiar that the

8   government is not precluded in a suppression from using that

9   information when they had played no role in its being obtained.

10  I am not able to explain the prosecution decisions that are

11  reached, and I have enough knowledge of the matter to know that

12  if you're not inside, you can't know all of that -- all of the

13  material that factors into the decision to charge, but I do

14  resist the notion that Mr. Demasi could have done more or that

15  Mr. Demasi was the only one, or that it was his word against

16  theirs, because that, frankly, is not the case.

17          If the government in this particular office, which

18  has a tradition that's hard earned and well deserved for making

19  appropriate decisions in prosecution, if they decided not to

20  prosecute, I can live with that, but I can't let the Court

21  believe that it was because Mr. Demasi is overstating the

22  quality and the quantity of information and cooperation that

23  he's provided.

24          Your Honor, in terms of the 3553 comments that the

25  government made, the fact is that this one individual whom I'm

1    choosing not to name in court, but whom I'm sure the Court

2    knows is the one who had this Black Box trading program, the

3    one who said on tape that he was lying to the CFTC, well, this

4    individual received over $2 million from Mr. Demasi out of

5    these investor funds.

6         And I want the Court to understand that when we talk

7    about the loss figures in this case and we talk about them in

8    the context of guidelines applications and so forth, it would

9    be completely erroneous to think that anybody has traced $3.9

10   million or 3 point any number of millions of dollars and said,

11   "Oh, they've gone to the defendant.  It's just another 'made

12   off'-like Ponzi scheme."  That could not be more of a

13   distortion about what happened here.

14        What happened here is that Mr. Demasi committed

15   crimes and deceived people, but he wasn't very good at it, and

16   that's why he's where he is.  But the problem was that much

17   sharper and, frankly, much more dishonest people recognized

18   that Mr. Demasi had an amazing capacity to get people to invest

19   money, and they absolutely ripped him off.  They absolutely

20   used him like a tool to get money.  And this particular

21   individual took millions of dollars in licensing and usage fees

22   that were paid by Mr. Demasi for this Black Box.

23        And one other fact that I think the Court must

24   appreciate:  Don't believe that the Black Box was just another

25   pie-in-the-sky piece of hokum.  The Black Box produced millions

1 of dollars in trading profit. There's just no question about

2 that. There is just no question that those millions of dollars

3 in trading profit were generated by that individual, and that

4 he kept it all because he denied that he had the agreement that

5 he had with Mr. Demasi.

6 Now, if Mr. Demasi had been able to fund a

7 substantial litigation effort against that individual, who

8 knows what would have happened, but he wasn't, and so we're

9 sitting with the facts that we've got. But in the FBI 302s, in

10 the interviews, and in the materials in this case, it is beyond

11 dispute that that Black Box program made money, and Mr. Demasi

12 believed that it would make money.

13 Now, the notion, therefore, that -- well, let me just

14 say this. This isn't a Ponzi scheme, Judge. This wasn't

15 someone who came into town and thought, "I'm going to talk a

16 bunch of people out of their money."

17 The government made a comment that I want to return

18 to, because I think it's telling. The United States said, "You

19 know, this person was even taking money from his friends," and

20 that's true.

21 Now, there's nothing that will pollute and harm a

22 good friendship like dealing in financial issues, but,

23 nevertheless, here's the point I want to make. Mr. Demasi took

24 money from his friends because he thought he was putting them

25 into the absolute winning trading investment program of the

1    year.  He thought he was doing them a favor.

2            Did he lie to them?  Yes, he did.  Did he give them

3    materials that misled them about the past performance of the

4    fund?  He did.  Did Mr. Demasi come in and stand before the

5    Court, without the benefit of a plea agreement, and take a

6    blind plea and essentially throw himself at the mercy of the

7    Court because he was willing to acknowledge those mistakes?

8    Yes, he did.

9            He didn't go out and find susceptible old ladies or

10   widows or people that he would never see again and try to rip

11   them off.  He went out to find friends and people that hang

12   around Rush Street that have an awful lot of disposable income

13   and that are interested in nightclubs and told them, "We're all

14   going to get rich together," and he believed it.

15           Now, were they foolish to believe him?  They're all

16   foolish.  But their foolishness was not borne of a plan on Mr.

17   Demasi's part, where he gets up in the morning and decides,

18   "You know, I want to go hurt people today.  I want to go take

19   money from people today and never pay it back.  I want to go

20   ruin a few lives today."  That's not Mr. Demasi.  That's not

21   remotely close to what the facts in this case are.

22           This is a guy who came to Chicago with, as the

23   government and I agree, a lot of talent and a lot of natural

24   advantages.  God blessed him with wonderful parents who are in

25   the courtroom today and with a fine education.  And for a

1   while, he was doing things that were consistent with all of
2   that.

3          He decided that life would be more worthwhile for him
4   if he could be a nightclub operator.  And, Judge, you could
5   almost take judicial notice of the fact that he hit the jackpot
6   there.  I don't know one club from another, Judge, but I'm told
7   by people much younger than myself that in its heyday, the
8   nightclub that he owned was the hottest place in Chicago.

9          This is a kid who came in and, all of a sudden, it
10  seemed as easy as he thought it would be.  You could find
11  people with money.  You could find people that had wonderful
12  foolproof ways to invest that money.  You could do a little of
13  this and a little of that and get a nightclub, and, all of a
14  sudden, pro athletes and famous people are going to come and
15  see you.

16         There were all kinds of things that he was
17  accomplishing that made it seem like the proverbial "world was
18  his oyster" kind of guy, and what he found out is you've got to
19  be real smart and real mean to make big money and keep it.

20         Well, he was real smart, but he wasn't real mean, and
21  so people like the people that I've referred to in my
22  presentence filings come in and they see this kid.  They read
23  the papers.  He's in the gossip columns.  They know where all
24  the people are going to the nightclubs.  They start to buddy up
25  to him.  They start to tell him about foolproof programs, they

1    start to promise them that there will be a split of the

2    profits, and then they leave him high and dry.  If he was mean,

3    he could have documented the matters better.  If he was sharp,

4    he would have had lawyers involved.  But he was foolish.  He

5    believed that God gave him the talent and the judgment and the

6    wisdom to pull this off by himself.  He didn't understand that

7    the richest people in the world, the reason they got rich is

8    that they understood at the beginning:  You can't do this by

9    yourself.  You need professional help.  You need lawyers and

10   accountants and auditors and all these other things.

11            But I must tell you, Judge, if you were to look at

12   the prospectus documents that were issued on these Tsunami

13   entities, time and time again, you would see bold print,

14   all-caps paragraphs:  There are no guarantees of success.  This

15   is a risky venture.  You are going in with people.  Demasi

16   doesn't know beans about commodities trading.  He's relying on

17   these other people.

18            Rich people, by and large, put their money in because

19   they wanted to say, "I got a piece of the action on Rush

20   Street.  I got a piece of the action at the hottest clubs in

21   town."  It's not that I'm saying they should have been -- we

22   should ignore the fact that they were ripped off.  But I want

23   the Court to appreciate that this was a result that was not

24   what was set out to happen.

25            Mr. Demasi really set out to be kind of a well-known

1   guy, a rich and successful guy.  He thought that's what his

2   talents would prevent -- present him as an opportunity.  But he

3   wasn't as smart as he thought.  He wasn't nearly mean enough.

4   And now he's sitting in a very bad place.  And the people who

5   are smarter than him and meaner than him are spending the money

6   that he raised.

7            Your Honor, the fact is that Mr. Demasi has come to a

8   very difficult place.  Judge Gettleman has issued the

9   restitutionary award that the government referenced.  Mr.

10  Demasi understands that he has financial obligations to the

11  victims that are going to follow him for the rest of his life.

12  He is not a person who thinks that his life has been

13  interrupted.  He's a young man who thinks that his life has

14  been changed permanently, irreversibly, necessarily.

15           Judge, there is not an ounce of defiance in this kid.

16  There isn't any anger that the government is pursuing these

17  charges.  There is an extreme amount of fear.  There is a deep

18  reservoir of regret.  But, Judge, there are people who try to

19  make their living by stealing the money of other people.

20  That's what they decide is the way they choose to make their

21  way through life.  Those are the people that the guidelines

22  address.  Those are the circumstances where the range of the

23  guidelines that's put forward in this case are appropriate and

24  correct.

25           This isn't that person.  This is a person who has the

1    issues that are addressed by the two physicians whose reports I

2    have shared with the Court.  This is a young man who's had

3    ADHD, a young man who's had other maladies diagnosed, discussed

4    at great length by those physicians.

5                We're not saying that he wasn't capable of

6    understanding his conduct.  We're not asserting any defenses

7    that are elements of the offense.  But I am here to tell Your

8    Honor that people have disadvantages.

9                I agree with Ms. Perry, whose remarks were typically

10   very pointed and very effective.  It's easier when the Court

11   looks at an individual who came from a broken home or from

12   poverty or from depravation and who tried to get money because

13   the need was a constant need from the day the person first drew

14   a breath.  But I think it is important to understand that the

15   disabilities and the problems that can negatively impact on a

16   person's life aren't always visible.  They're not always

17   economic or socioeconomic.  Sometimes they're emotional.

18   Sometimes they're physical.  Sometimes they're mental.  But

19   they are problems, and they have an impact, and it's

20   appropriate and just for the Court to incorporate those issues

21   as you think about the decision that you are going to reach

22   today.

23                Your Honor, Mr. Demasi has a lot to offer.  I believe

24   that he has learned a lesson.  I don't mean that today is the

25   end of that instruction.  He's going to suffer today, and he's

1    going to suffer for quite some time.  He's going to suffer

2    spiritually, mentally, and he's going to experience

3    depravations physically.  He's got a lot of debt to work off.

4    He's got no chance of practicing law.  He's got no chance of

5    working in any representative capacity in any investment

6    industry.  That's not a question of his decision.  That's by

7    operation of law.

8            The notion that this young man is going to be in a

9    position to follow the course that he was on before isn't

10   really squared with the realities of having a felony

11   conviction.  But he has talent, he has energy, he has a

12   deep-seated genuine desire to make recompense to those he has

13   harmed, friends as well as former friends, wealthy as well as

14   those who suffered more in proportion.  He holds no animosity,

15   but he wants, Your Honor, the chance to make something of these

16   talents and these opportunities that God has given him.

17           Your Honor, a lot of things are said about people

18   when they get into trouble like this, and a lot of labels are

19   applied.  The worst thing that happens, in my estimation, to

20   cases like this and those of us who litigate cases like this is

21   that we've now got the convenient "made off" label, which is

22   just a gloss on the older convenient "Ponzi scheme" label.

23           I know that this Court looks behind labels and looks

24   behind counts and statutes and looks behind guidelines

25   applications.  I know that this Court seeks only to do justice.

1          I have to urge the Court in this case that justice

2    can be tempered with mercy, not as a matter of sympathy, but as

3    a matter of trying to make sure that the talents God placed

4    inside Tony Demasi can still produce benefit, can still bring

5    forward good things.  And I implore the Court to fashion a

6    sentence that promotes and nurtures his ability to use those

7    talents to repay his victims and to do good things.

8          Thank you, Judge.

9          THE COURT:  Thank you.

10         (Probation officer enters.)

11         THE COURT:  Ms. Perry, did you want to respond?

12         MS. PERRY:  Just briefly, Judge.

13         Judge, I do agree, and I -- if I have not done

14   anything to tacitly acknowledge, I'd like to explicitly

15   acknowledge that Mr. Demasi did everything he could when he was

16   cooperating.  The problem is, quite simply, he did a lot more.

17   He was of limited usefulness for all of the reasons that Mr.

18   Rotert stated already, and then the other problem is he

19   continued to engage in illegal conduct.  He continued to

20   generate illegal recordings despite being told not to.

21         The government is not afraid to use bad people as

22   witnesses.  I myself have put murderers on as cooperators.  I

23   have called drug addicts as cooperators.  And each person needs

24   to be looked at on their own and on their own merits.  And the

25   significant thing about any cooperator is despite whatever

1    baggage they have, whether they are being totally honest and

2    forthcoming with the government and whether they are no longer

3    engaging in illegal conduct and lying to people, unfortunately

4    Mr. Demasi continued to do both.

5            With respect to the two individuals that Mr. Rotert

6    still is trying to convince the Court should have been charged,

7    the problem is we do have one person's word versus another.

8            And with respect to the individual who Mr. Rotert

9    talked about, first of all, who was encouraging other people to

10   invest in Mr. Demasi's Tsunami accounts, it's true, other

11   people say that they were approached by this person and this

12   person got them to invest.  The problem is everybody

13   acknowledges that person had made huge amounts of money on his

14   investments.

15           Now, according to Mr. Demasi, he was being extorted

16   out of that money.  He was a victim of this other person.  He

17   was only paying him because he felt like he had to.  But

18   there's another side to that story which is this person was

19   making huge amounts of money, far more than he invested in

20   Tsunami.  So to charge that person with engaging in fraud

21   alongside Mr. Demasi, it would be based solely on Mr. Demasi's

22   word.

23           With respect to the CFTC recording that Mr. Rotert

24   talks about, first of all, the person never says, "Oh, yes, I

25   lied to the CFTC."  There are certainly things in the recording

1    that make it sound that way, but there's also things in that

2    recording where that person is accusing Mr. Demasi of

3    fabricating documents and himself lying.

4          So, as Your Honor knows, there's a huge calculus that

5    has to go into whether or not someone can be charged.  The best

6    the government could do is take all of the information it

7    receives and in good faith make the decision, and here we

8    simply could not make a decision that other people were

9    deserved to be charged based solely on Mr. Demasi's word and

10   documents that he provided.

11         And we can't reward people who just try hard.  It is

12   too easy for people to try hard in front of us and then do

13   things that minimize their cooperation and its effects later.

14   For all of that reason, we have to maintain a standard in terms

15   of charging decisions, and that standard has not been met here.

16         Mr. Demasi continues to portray himself as a victim,

17   as a victim of people who want his clubs, of a victim of shady

18   financial traders.  The fact of the matter here is not that he

19   was too nice or that he was victimized, Judge.  It was that he

20   felt entitled to do what he wanted with other people's money,

21   and that he felt his reputation was more important than other

22   people's retirement income.

23         And for all of those reasons, we feel the sentence of

24   imprisonment is appropriate in this case.

25         THE COURT:  Thank you.

1        I do want to hear from Mr. Demasi, but I think it's

2   also incumbent on me to ask whether there are victims of Mr.

3   Demasi in the courtroom who wish to be heard.

4        MS. PERRY:  Judge, I'm not sure because we weren't

5   able to notify them of the earlier time.  Now, it could be that

6   they are here now because we are approaching noon.

7        THE COURT:  Yes, there is -- it is noon.  I want to

8   ask, are there people here that would like to be heard, victims

9   of Mr. Demasi?

10       MR. OUZOUNIAN:  Yes.

11       THE COURT:  Yes?  If you'd like to step forward, you

12  are welcome to do so, sir.

13       MR. OUZOUNIAN:  Thank you, Your Honor.

14       THE COURT:  And the probation officer is here as

15  well.  I will invite you to introduce yourself for the record

16  in just a moment.

17       MS. RAY:  Sure.

18       MR. OUZOUNIAN:  Sure.

19       THE COURT:  Thanks.  Sir, could I ask you to state

20  your name?

21       MR. OUZOUNIAN:  My name is Marco Ouzounian.  I was a

22  member on the junior board of Tsunami --

23       THE COURT:  I'm sorry.  I need to ask you to spell it

24  because my court reporter is not able to.

25       MR. OUZOUNIAN:  I apologize.  O-u-z-o-u-n-i-a-n.

1          THE COURT:  Okay.  Sorry.  Go ahead, sir.

2          MR. OUZOUNIAN:  May I proceed with my speech?

3          THE COURT:  Sure.

4          MR. OUZOUNIAN:  Great.  Thank you.

5          I met Tony Demasi in 2004 when I had joined the

6   junior board of the Tsunami Foundation.  I was truly inspired

7   by what we were accomplishing and how Tony led the foundation

8   to help young kids find their career paths with funding

9   scholarships and mentor partnering.

10          A lot of inspiration came from helping others, but I

11   also learned how to help myself.  Tony inspired and led me in

12   to taking a leap to opening my own company in the IT business.

13          After starting my own firm, it was Tsunami that would

14   become one of my first clients.  I was able to get close in

15   view of Tsunami's operations, working with its IT and

16   technology development.  By accomplishing these -- excuse me.

17   By accomplishing these tasks, I was able to observe the

18   positive direction the company was heading.  This led me to

19   inquire how I could get involved as an investor.

20          I placed my own personal earned money into Tsunami

21   Lakeshore Fund.  I chose this investment due to the high

22   technology Tsunami was using to trade.  I began to watch the

23   trading system they were constantly working on.  I also had the

24   pleasure to meet their head -- the head trader of the program,

25   Mr. Simonsen, while he was in from out of town.  I was able to

1  speak to him briefly and could not help but be impressed about
2  the trading system.  The way he spoke about the program and the
3  technical executions I saw appeared revolutionary.

4          When I found out about the charges -- excuse me
5  again.  When I had found out about the charges against Tsunami
6  and Tony, I was upset.  It was hard to understand how
7  everything could come to a stop in one day's time.  The money
8  lost was money I could have used, and it would have been great
9  and helpful to me to have.  Of course, I would never sink my
10 last dime into an entertainment business, a hedge fund, or any
11 private investment in general, but, still, money is money.

12         After looking at all these facts over the time since
13 the day in 2007, it is clear to me while some poor judgment was
14 exercised, Tony's actions were not malicious.  It is very clear
15 some of our occurrences -- some of the occurrences that
16 transpired were out of his control, and that other participants
17 were involved to get to this present-day situation.

18         But what I will never forget is the reaction I saw on
19 Tony's face when I asked him about these events.  It was
20 beyond -- he was beyond fully apologetic in everything,
21 especially about his mistakes.  When I pressed for more
22 information, he had also informed me the sale of the trading
23 system and how his partner breached his contract.

24         With that being said, with that being said, other
25 investors and myself have constant thoughts.  One, why is he

1    the only one facing charges and being held accountable when it

2    is clear from the facts that his partner is successfully

3    gaining the reward with the property people have sweated over

4    -- in case point, Tony -- or funded an investor, such as

5    myself?  That does not make sense.

6           Two, while Tony's actions may have not been wise, he

7    has taken accountability and has tried desperately over the

8    months to fix the situation.  He has remained in Chicago.  He's

9    answered questions.  He's answered phone calls, et cetera.

10          Third, Tony's past is such that this act was out of

11   character, and his remorse is beyond evident.

12          I have checked on Tony and remained friends with him

13   over this period, although circumstances have not been the

14   easiest thing to manage.  He is depressed, and he is very shut

15   in when anything social comes around.  Then, on the other hand,

16   I know he is still working with underprivileged children in the

17   musical arts area and, again, trying to be a good person.

18          I have seen a man lose everything, become a shell of

19   himself, live with threats, public embarrassment, and basically

20   having to walk a long road of needles, hoping it would end.

21   But I have not seen him quit nor be negative in any fashion,

22   and because of this, I do not feel that it is fair to quit on

23   him.

24          If I had to say, I would graciously express my

25   opinion that he deserves another chance and an opportunity to

1    rebuild some of his life back and allowing him to continue his
2    great public service.
3              Thank you.
4              THE COURT:  Thank you, sir.
5              Are there other individuals who'd like to be heard,
6    either victims of Mr. Demasi's scheme or others who'd like to
7    be heard in his defense?
8              Mr. Demasi, you are also entitled to make a statement
9    if you wish to do so.
10             THE DEFENDANT:  Thank you, Your Honor.
11             I'm going to try to keep these remarks fairly
12   condensed, but I do have a lot to say.  So if you have any
13   questions or anything, please stop me.
14             THE COURT:  All right.  You are welcome to make your
15   statement.
16             THE DEFENDANT:  Thank you, Your Honor.
17             I'd like to take this opportunity in front of the
18   Court to sincerely apologize to Your Honor's court, the justice
19   system.  I allowed my behavior to get to the point where legal
20   action was taken.
21             I need to apologize to my family, friends, and
22   employees, many of whom I did consider family.  But, most
23   importantly, my apology is to the people whose reckless actions
24   I hurt financially.
25             I feel bad and remorse about this every day.  Others

1  that are not here in the courtroom, it doesn't make my remorse
2  any less, and I am almost beyond words about how bad I feel
3  about these actions that caused this.

4  I was inspired by a famous American clergyman, Tryon
5  Edwards, that said:  Right actions in the future are the best
6  apologies for bad actions in the past.  I could not agree more.

7  My apology came from the understanding that my
8  actions were wrong and affected other people.  My apology is
9  one thing, but I would also like Your Honor to examine what I
10  did after my wrongful acts to remedy the situation and improve
11  myself.

12  I've lived with the pain over the last three years,
13  greater than I knew could exist.  My hurt and remorse is very
14  deep and caused me to want to crawl into a foxhole, away from
15  Chicago and hide.  The embarrassment and shame caused me to
16  want to run, but I didn't think that was the right thing to do.

17  I understood that the only way to show everyone I was
18  truly sorry was to pick myself up, stay and to work on a real
19  remedy, and fix what I could by my broken actions.  The road to
20  this redemption has been tumultuous, but so far, it has brought
21  along real change.

22  My cooperation was done with the government not out
23  of a bitter hatred towards anyone or trying to get back at
24  anyone or anything like that.  I did it because it was the
25  right thing to do.

1       From the moment I was charged, I wanted to tell the
2   whole truth and tell everybody anything I could do to fix the
3   situation.

4       The first attorney I hired would not let me
5   cooperate.  He counseled me to remain silent, and he said that,
6   "In order to better help yourself, you will be" -- "you will
7   not mention anything about this.  You will follow my lead, and
8   I will walk you through it."  But I felt that this was the
9   wrong thing to do.

10      I had a real hard choice to make.  The money that I
11  had invested in that attorney was limited, my resources were
12  limited, so I, you know, had a tough choice there.  But I
13  realized that it was the right thing to do.  And by the grace
14  of my parents and my family's support, I was able to hire a
15  very good human being and a good attorney, Mark Rotert.
16  Actually, a great attorney.

17      With Mark's guidance, I systemically told authorities
18  about the case in a very detailed and honest way.  But one of
19  the main keys that I wanted to provide for authorities was the
20  truth about the trading system and how the whole issue came
21  about and worked in a very detailed way.

22      Tsunami funds were used to purchase a working trading
23  logic and pay its designer for the perpetual trading deal.
24  Tsunami officers, including myself, spent years fostering a
25  workability, packaging marketing of this trading system to a

1    third-party capital provider.  The deal was accomplished.  A
2    contract was signed.

3         It was not only myself that was involved in this
4    deal.  There was another individual every step of the way by
5    the name of Jim Levin.  He did testify in front of the CFTC.

6         Further, there have been many other officers -- well,
7    not many other, but another officer in Tsunami that worked with
8    me, and a sales team, Mark Asuza.

9         I really tried to show where this money went and
10   tried to recover this money, knowing that it would not go to
11   me; it would go to investors.  As I said, my resources were
12   very limited, so I worked very hard, and the money that I was
13   going to get paid went to retain an attorney to give my best
14   efforts to try to recover this money.

15        My efforts were unsuccessful, and the other party had
16   a very big legal team, whereas I had very limited resources at
17   all to work with, but I tried my best.

18        But, really, it's my attitude and behavior that
19   needed to change.  And I realize that my ubers and my egos were
20   hurdles that I needed to get over, and I held back the proper
21   decision.  Not wanting to fail and looked upon as a failure --
22   or looked upon as a failure, I chose reckless actions.

23        I did a lot of study on this and have worked with a
24   professional on this matter, but after all contemplation, the
25   solution for me is what I had been taught from a young age.

1    Spiritual guidance had to be the top of my life.

2            One reflective reading I did discussed ego.  It says

3    "ego" stands for Easing God Out of our lives.  It was clear to

4    me that this is what I had done.  My busy schedule had aided in

5    the idea that I believed that being involved in other causes

6    made me a good person.  I was thanking myself and my talents

7    for my perceived success and not paying attention to the road I

8    was headed down.  Instead of knowing the journey was the most

9    important and giving credit to my Creator, I chose to thank

10   myself.

11           Being more spiritually mindful, I doubt if this

12   situation would have ever come about.  And while the road back

13   is not going to be easy, having a driver who could light the

14   road sure helps.

15           I also know that I couldn't do this on my own, so I

16   went and I sought out professional help and therapy for

17   problems and understanding some self-defeating mechanisms in

18   myself that caused these missteps.  I sought out this help on a

19   professional level immediately and tried diligently not only to

20   stick with it, but follow the advice of these therapists.

21           Self-awareness, therefore, has been a recurring theme

22   since these life changes are made.  I understand that it has

23   its ups and downs, and I must continually improve upon the way

24   I deal with these fluctuations.  I will continue to use my new

25   support system and continue treatment.  I realize many of the

1    mistakes I have made are from my deficiencies, and I will
2    continue to grow and not be derailed again.  I will continue to
3    get this help and work with these support systems.

4            A particularly embarrassing part of this is
5    addiction.  And through my life, I had never had the type of
6    problems, even when I was immersed in a potentially stressful
7    situation.  For me to tell this Court that my phobias and
8    addictions will not be tolerated is what I mean.  I have had a
9    long history of abstinence with these problems, so I did not
10   know the sheer power of this, of addiction.

11           By the time I realized I had this problem, I was too
12   far along to help myself.  I realized that seeking treatment
13   was the right thing to do, again.  But the position I was in,
14   and the scary position I was in, I let it gone -- go too far.
15   However, I want you, Your Honor, and the court and everyone to
16   hear from me today that this is something I now understand much
17   better and will not let affect my life in this way again, and I
18   will work very hard to change this as well.

19           The affiliations in my life were altered.  I used to
20   have a group of people that I was around that cared and loved
21   for me, and when I got here and I started to work in the city,
22   I made some bad decisions on people that I affiliated with.  It
23   was this unbridled passion for success that led to some of the
24   poor choices.  I wanted to seek the ability to fulfill my
25   dreams and my friends' dreams, but I was too impatient.

1    Therefore, I chose a mentor and an ideology that was misplaced.
2    I chose manners that promised quick power and fast results.  My
3    own pride and my own fear led to this choice before I could
4    process the journey.  I was too far along.

5           But thinking I could maintain control of my poor
6    affiliations was ridiculous.  I have always been proud of the
7    diversity and open mind that I have.  However, when it comes to
8    affiliations in the real sense, they were misplaced.

9           I have learned now to delineate acquaintances,
10   clients, and even co-workers from those that could have any
11   influence on my real behavior.  This has been hard.  Times for
12   me have not been easy.  I have been alone and emotionally hurt.

13          I understand the vulnerability and the place that
14   being in could lead to wrong choices in people again, so I am
15   ever mindful of this.  Self-awareness is something that I
16   continually talk about in front of Your Honor, and it's
17   something that permeates every decision and choice that I have
18   to make.

19          I am proud of some things, and I am proud of the
20   charitable work that I have done in the past.  And I am proud
21   that while this was going on, I was able to remain active in
22   some causes I believed in.

23          The Make a Wish party I threw for the young girl was
24   not out of my own pocket.  It was done with -- in conjunction
25   with the charity.  It's something I'm very proud of.  I also

1    spent a great deal of personal time working on that.

2            Other community outreach groups I formed in the past
3    were Ghost Writers, Inc. and Ghost Records.  They used to be
4    things that dealt with independent music.  However, the focus
5    changed to hip-hop music.

6            I have been able during this time that the Court has
7    provided me to work with these young people and to produce,
8    market, and manage their talents while providing a creative
9    outlet for some that have special meaning in their lives.  Some
10   of these guys are in the courtroom today, and I thank them as
11   much as for what they've given to my life as I've tried to do
12   for them.  I have been proud of the affiliation, and it's
13   something that I really enjoy and really think that has been
14   good.

15           I want to tell the Court a little bit about who I am
16   today.  You've heard some things said about who I am.

17           I am from a small town in Michigan, a loving family
18   where money was never really discussed.  Instead, we talked
19   about traditional family things, values, beliefs, and helping
20   each other.

21           When I was leaving for college, a 17-year-old fresh
22   out of high school, I could not wait to go.  College seemed
23   exciting to me.  My parents excitedly helped me as their oldest
24   son pick out items for college, for my dorm room and et cetera.
25   And as that day came, I recall making several trips back and

1  forth with my parents, loading my car and saying the good-byes.

2          At the end, my father stopped me, turned me around,

3  and looked me in the eye and said, "Son, I'm proud of you, but

4  always remember you always have a place in the Demasi house

5  here in Clare, Michigan."

6          This statement took me by surprise.  I drove off and

7  could not help but think my own father thinks I'm going to fail

8  out of school.  Wow.  He must not really have that much faith

9  in me.

10          But it was not until five years later that I started

11  to understand what he meant by that statement, and it was at

12  this point in my life now where I understand its full meaning.

13          My father was saying to me:  Remember who you are.

14  Remember your decorated war veteran of World War II grandfather

15  who taught you business, trades, and responsibilities of a man.

16  Remember how close you are to my immigrant parents whose

17  background and struggles they went through just to make it to

18  this country so I could now give my son this opportunity to

19  have a first-rate education.  Remember us, the tight family

20  that we have.  And no matter what, we will be there for you.

21  Remember your beliefs and faith; the Saturday afternoons you

22  reluctantly went to catechism class as a kid, but you stuck it

23  out; the ideals and questions you wrestled with to find out who

24  you were.  Remember all the lessons of hard work and honesty,

25  about the many experiences we have shared with you.  And

1    respect and accept others' views.  The perseverance you managed

2    and worked for me unloading trucks during the weekend and the

3    honest business.  Think about the school and activities that

4    you've been in where you're not always the biggest, fastest, or

5    strongest, but you worked until you achieved a level of success

6    and excelled.  Do not let anyone get in your head and make you

7    think you are less of them.  Do your very best, Son, but most

8    important, keep your integrity and your journey, for the

9    journey is the most important part, not only the end result.

10          Since the day I left that house, I have received a

11   top education and had some exceptional experiences that I have

12   often taken for granted.  Yet, nothing permeates in my mind as

13   what they've said.

14          When looked at the dichotomy of this with my first

15   job, real job at Bear Stearns, where I was told something

16   different -- at Bear Stearns, I was taught:  You innovate, you

17   participate, and, if you need to, you litigate.

18          I recall the Wall Street Journal running a story that

19   compared the then World Champions Chicago Bulls with the top

20   five at that investment bank's salary.  Bear Stearns executives

21   made more than the starting five on the Chicago Bulls or the

22   starting team of the New York Yankees.  They taught me:  Eat

23   what you kill.  This is a dichotomy, a world apart from the

24   lessons of my youth.

25          But what I know now is this.  Bear Stearns is gone

1    and out of business, it no longer exists, but the love in the

2    Demasi family is still here.  I rediscovered what my father

3    taught me.  And a man takes responsibility for his actions.  He

4    does not act in a way that could even possibly harm others.

5         What my mother showed me is that being a good person

6    is showing care and compassion for those problems larger than

7    your own; and that her seven-year education was spent in a

8    commendable career, has been helping people that could not help

9    themselves.

10        They've showed me that success is being married and

11   still in love for 39 years, having your own bills paid for in

12   full without looking over your shoulder, and having children

13   that love you so much, they would do anything for you.

14   Unfortunately, I temporarily forgot.

15        After these failures, there are a couple of

16   directions you can go.  For me, I fell so far that it was much

17   easier to do more things in a positive way and move up.

18        While I have discussed specific efforts of

19   rehabilitation and touched and acknowledged specific need for

20   highlighted self-awareness, my metaphysical discovery process

21   started in a very dark place.  I thought about it, and I

22   believe that the point I was at was one of the unwanted and the

23   unneeded.  Society's outcast, pariah, and villain I had become.

24   But this experience, the publicity, I have learned from that,

25   and I have learned to feel real feelings.  I have learned to

1  build on those feelings and understand that examination of
2  yourself can come sometimes when you have the least.  It allows
3  self-introspection, and it reminds me that actions always have
4  consequences.

5      The pursuit of those intentions on a daily basis
6  matters still to me every day.  The journey of the past has
7  only provided a steppingstone for a unique opportunity for
8  growth that can exist.

9      It was not until the time where I became the lowest
10  low that I could examine my raw self.  My honest definition of
11  success has even changed now.  The pursuit of Wall Street
12  wealth and a life of the bright lights is now replaced by a
13  more subdued exterior, a person that has now -- in his heart
14  really believes in all the basic teachings of his family that
15  he learned growing up:  Interactions with good people,
16  self-awareness, spirituality, and the purpose of the journey
17  and stages of the road to goals matter over the end result.
18  This new awareness has led me closer to the vassal of truth.

19      My crime has led to absolute destruction of my life.
20  Before I was charged, even at that point, the problems were
21  eating away at me.  I had not gotten any benefit from this.
22  After the charges, my loss was absolute.  I lost my business.
23  The dream of our own entertainment venue was destroyed and
24  those who worked out there with me, even my own brother, people
25  I cared about dearly, friends that I would never want to see

1    hurt.  Everything material I had was gone, including savings,

2    home, car, and career.  My law license I worked so hard to

3    achieve is gone.  My securities license and ability to practice

4    law removed.  Good friendships and relationships dashed.

5    Friends I had once figured would love me forever for more than

6    success and be very happy with the money I made them now did

7    not speak to me.

8            I have been devastated.  My good name and reputation

9    was replaced by the status of a public pariah.  The charity I

10   founded and cared deeply about was unwound.  And there's this

11   time, this three years that I have gone through, the most

12   lonely, painful, abysmal time in the world.

13           A small shortcut of my criminal actions never really

14   provided one minute of enjoyable satisfaction.  I realized I

15   could have accomplished anything walking down the path instead

16   of running.  I could have done everything without those stupid

17   actions.

18           My living situation now -- and there's been some talk

19   about how I'm living now -- is paid for by the love of my

20   family, and it was chosen due to a safe place to live.  And

21   they are the ones paying the bills and stay in the place when

22   they come to Chicago.  It is done, you know, graciously for me,

23   but it's not any part of my lifestyle.  My lifestyle is not one

24   that has a lot of money.  In fact, almost none.  I don't walk

25   around with a lot of money.

1     A conversation with a girl that was a friend who --

2   you know, we spoke of various things.  A lot of those things

3   spoke about, they were snapshots.  Never did I have any

4   $200,000 coming in or anything of that nature.

5     So I guess I'll leave this by talking to you and

6   asking you for forgiveness.  And I know that forgiveness does

7   not change the past, but it could help my future.

8     I ask you to make a judgment that provides me real

9   hope for the future.  I promise to you, Your Honor, that a

10  second chance would not be wasted on me.  I have no doubt I

11  will experience some difficult hurdles in the future, but I am

12  now ready to get over them with integrity and honesty and help.

13    I could list to you a bunch of different reasons and

14  advocate a position, but I'd like to leave this by just saying

15  that I'm sorry.  I wanted to tell you and I wanted to hear you

16  -- or allow you to hear me speak, to express the progress and

17  regret, and allow you to see that I understand the need for

18  more personal growth and self-awareness in the years to come.

19    I leave it in -- I beg you and beg for the -- and

20  pray for the Court's mercy, Your Honor.  Thank you.

21    THE COURT:  Thank you, Mr. Demasi.

22    Many of us judges comment that the process of

23  sentencing is the most difficult and often very unpleasant

24  thing that we have to do, and this case is really no exception

25  to that rule.  It's always hard to pronounce a sentence on

1     someone who appears to be genuinely remorseful about what he

2     did.  And in this case, we're talking about somebody whose

3     crime was one that was purely financial and not violent.  No

4     one is suggesting otherwise.

5             Mr. Rotert has argued for a sentence of straight

6     probation, and Ms. Perry argues that a guidelines sentence is

7     warranted in this case for a number of reasons.

8             Mr. Demasi is a complex individual.  Most of the

9     people that we sentence really are very complicated individuals

10    who bring to the courtroom both positive and negative

11    characteristics.  Mr. Demasi certainly has those

12    characteristics.  He's commented here today about his own

13    growing self-awareness and the values of religion and family in

14    his life.  He referred to his unbridled passion for success and

15    how that led him down, running down a road that he might have

16    been better off walking down.

17            Let me suggest that the unbridled passion for success

18    he's referring to appears to equate success with being well off

19    financially, and I think that's, you know, the words we use in

20    American society, but I think all of us recognize that making

21    money isn't how you become successful.  Making money is what

22    makes other people believe that you're a success.  But the real

23    success is in having, you know, loving relationships that are

24    yours to keep forever.  Making money quickly and making money

25    easily is not necessarily success.

1    Many of the -- what happened for Mr. Demasi was
2    apparently some real effort, real need to make money in a
3    hurry, not in the ways that other people do with, you know,
4    ordinary jobs where you go to work every day, but investment
5    schemes that would somehow turn, you know, a small amount of
6    money into a lot, that would somehow magically create wealth.

7    It's clear to me that Mr. Demasi has every desire to
8    turn away from that lifestyle.  It's nevertheless, I guess,
9    distressing to see that as recently as January of this year, he
10   was engaged in a communication with a friend about a
11   sports-betting organization in which he expected to make money.
12   And it's just time to put betting, investments, speculation,
13   easy-money schemes out of your life.  It's just -- you'd be
14   better off working as a day laborer.  This is not the way to
15   success, to try to get some quick scheme, something for
16   nothing, some kind of easy way of collecting money from other
17   people and then dividing it.  It just makes no sense.

18   There is also the hint in this e-mail exchange of Mr.
19   Demasi being in a position of providing drugs for people.  Mr.
20   Demasi, that doesn't make you a friend.  It makes you a drug
21   dealer.  You know, that's not a fun way to live either.

22   You know, you may have an explanation for that.  I
23   don't know what it might be.  But there's certainly a flavor in
24   here of impropriety that is disturbing because it has happened
25   at a time long after you were indicted, long after it was clear

1  that you had been apprehended by the government and during a
2  period of time while, I understand, you were attempting to
3  cooperate.

4          I do want to talk about cooperation.  From the
5  Court's perspective, the success of -- I don't want to use the
6  word "success."  The effectiveness of the cooperation in
7  bringing in other defendants for prosecution is not terribly
8  important.  I realize that from the government's perspective,
9  it is.  Whether or not Mr. Demasi's cooperation generates
10 additional charges or evidence that support charges against
11 other people is something that the government for very
12 legitimate reasons has to care about.

13         From my own perspective, the real question is whether
14 or not the cooperation reflects genuine remorse, genuine
15 acceptance of responsibility, and a genuine effort to make good
16 on what's happened in the past.

17         I have no reason to believe that Mr. Demasi wasn't
18 doing all of those things.  His decisions to wiretap or to
19 record people in ways that he shouldn't have or was advised not
20 to, regrettable.  It appears that, again, that that grows out
21 of the motivation that he had to try to turn things around for
22 himself, and that's understandable.

23         So I do believe that Mr. Demasi's cooperation is a
24 factor that weighs in his favor here.

25         The support and love of his family who have been here

1  for him and are here for him is obviously very important as

2  well.  There are mitigating factors because his parents are

3  going to be waiting for him when he's finished with his

4  sentence, whatever that sentence might be.  And I know that

5  they will be available to counsel him in the direction that he

6  now recognizes is the way he wants to go.

7         That having been said, I have to also acknowledge,

8  just as Ms. Perry pointed out and Mr. Rotert made that point as

9  well, very often we sentence here people who didn't have

10  anything like the advantages that Mr. Demasi walks into the

11  courtroom with.  I can count on just a few fingers the times

12  that there's been a stable family, you know, married parents,

13  married, long-term relationship, supporting that person who's

14  being sentenced.  It's very rare.

15         This is an individual who had every advantage.  A

16  wonderful education, law degree.  Did extremely well in school

17  as far as I can tell.  This is a person who had everything

18  going for him.  Didn't need to go for some get-rich-quick

19  scheme or attempt to get-my-friends-rich-quick scheme.  None of

20  that was necessary for this man who has, as we've pointed out,

21  so much talent and so much ability.  It's, you know,

22  unexplained in a lot of ways and really regrettable that this

23  is the course that he adopted for himself.

24         I am sensitive to the comments that many victims made

25  to the probation officer when interviewed; that many of them,

1   several people made comments about the devastating distress

2   they feel about having been deprived of monies that they

3   believed were set aside for their own retirement.  There was

4   some comment that it didn't leave them destitute, but it

5   certainly changed their lifestyle or changed their ability to

6   do what they might otherwise have done.

7          And particularly in light of those comments from

8   those victims, I don't believe that a sentence of straight

9   probation is appropriate in this case.  I do think Mr. Demasi

10  should serve time in prison.  I think it is a decision that I

11  have to make that does promote respect for the law, it serves

12  as adequate deterrence, and makes the statement that wrongdoing

13  of this nature by somebody who really had every reason to avoid

14  it must be met with appropriate sanction.

15         The guidelines sentence here is a steep one.

16  Seventy-eight to ninety-seven months is more than I think is

17  necessary, but I do believe that a sentence of incarceration is

18  appropriate in this case, and I will impose a sentence of 60

19  months in the Bureau of Prisons to be followed by supervised

20  release.

21         There are five counts to which Mr. Demasi pleaded

22  guilty, and I am going to impose the same sentence that's

23  concurrent on all five counts.

24         There are also other matters that I want to address

25  relating to supervised release, and I am going to do that right

1  now.

2          While on supervised release, Mr. Demasi will not

3  commit another offense of any kind.  He'll comply with the

4  standard conditions adopted by the Court, and also will refrain

5  from the unlawful use of any controlled substances and submit

6  to drug testing and treatment, if that's appropriate.

7          We will direct that Mr. Demasi submit to DNA,

8  collection of a DNA sample; that he not possess a firearm or

9  destructive device; that he continue the payment of any

10  financial penalty at the rate of 10 percent of his net monthly

11  income.

12          The financial penalty, of course, is substantially

13  uncontested or can't be contested in this case, and that is the

14  amount of -- hold on just a second, the $3.1 million,

15  specifically $3,151,341, that will be a condition of supervised

16  release.

17          In light of that very, very substantial restitution

18  obligation and the $10 million civil judgment that he needs to

19  pay, the Court will not impose a financial penalty of any other

20  kind apart from the special assessment of $500, which is

21  payable immediately.

22          Continuing with conditions of supervised release, one

23  further comment in that regard.

24          If Mr. Demasi is unemployed after the first 60 days

25  of his supervision or unemployed for any 60 days after his

1    termination or layoff from employment, we will direct that he

2    perform 20 hours of community service per week at the direction

3    of the probation officer until he's again gotten a job.

4            We will direct further that he participate in a

5    mental health treatment program; and that whether employed or

6    not, Mr. Demasi will be required to perform 250 hours of

7    community service, again, at the probation officer's direction.

8            The one thing that I am not clear on at this point,

9    and I want to ask counsel for guidance, I know that Mr. Demasi

10   is the subject of a civil judgment imposed by Judge Gettleman,

11   and I wonder whether that overlaps in any fashion with the

12   restitution that's owed in this case?

13           MR. ROTERT:  Your Honor --

14           MS. PERRY:  Judge --

15           MR. ROTERT:  Go ahead.

16           MS. PERRY:  Judge, there is a large overlap in that,

17   and it can best be dealt with, I think, by the various

18   financial officers who are collecting the money.  Obviously,

19   any funds repaid towards the CFTC judgment that are part of

20   that 3.1 million will come off of this restitution order.  But

21   by imposing both, it allows both different groups to collect,

22   and there are various methods that they use.

23           THE COURT:  Mr. Rotert, is that consistent with your

24   understanding?

25           MR. ROTERT:  Well, certainly, it is my understanding

1   that the judgment entered by Judge Gettleman would subsume any

2   of the losses that we are discussing here.

3              THE COURT:  All right.

4              MR. ROTERT:  Judge, I respectfully ask if the Court

5   would reconsider.  He's got that civil obligation, the CFTC,

6   and there's a judgment entered in the Gettleman case.  I'm a

7   little anxious that if we put this restitution award on top of

8   that as a condition of supervised release, that we're going to

9   have a hard time some years down the road separating what was

10  paid for what purpose.

11             THE COURT:  I am concerned about that as well, Mr.

12  Rotert, and I certainly do not want confusion generated by

13  something that I put in a judgment order right now years from

14  now when somebody -- I would hope myself, but perhaps somebody

15  else will have to straighten it out.  So I'd like to get that

16  straightened out and I just need some suggestions on how to

17  word the J&C.

18             As you know, everybody knows, the restitution is not

19  a discretionary matter.  The only thing that's discretionary

20  here is what language do I use to make it clear that the

21  amounts that are collected from Mr. Demasi as a part of that

22  civil judgment are setoffs against his restitution obligation.

23             MR. ROTERT:  Well, Judge, I certainly recognize that

24  the NBRA says that restitution is mandatory, but I think the

25  statute also says that if restitution is provided for in some

1    other context, that that satisfies the statute.

2    What I would ask the Court to entertain is a

3    requirement, as opposed to a separate restitution order, a

4    requirement of condition -- or supervised release that he make

5    payments at a percentage of income levels toward the civil

6    judgment that constitutes both a restitution order in this case

7    and a civil judgment in Gettleman's.

8    In other words, the notion that it's a condition of

9    supervised release, it's got teeth in it and it says, "You are

10   in violation of supervised release if you are not making some

11   effort to pay the civil judgment," rather than saying, "Well,

12   there's a restitution award in this case of this amount of

13   money."

14   So since we've got a judgment that's on the books and

15   on -- you know, that's enforceable and not subject to any

16   collateral attack now, the condition of supervised release

17   would be the defendant shall pay 10 percent of his monthly

18   income after release and continue to make payments toward the

19   civil judgment in the case that the CFTC brought.

20   MS. PERRY:  Well, Judge, I'm not thrilled with that

21   only because then the U.S. Attorney's Office and their

22   Financial Litigation Unit loses the ability to try to get

23   payments.

24   Maybe what we could do is set this over for a week.

25   I could talk with someone from the Financial Litigation Unit

1   and see how they would suggest it be worded or talk to them

2   about how they generally work with other administrative bodies

3   when they have this type of issue.

4           THE COURT:  You know, I think that's a good idea.  It

5   will take me a few days to put together the J&C, anyway.

6           Mr. Rotert, you know, again, I'm sympathetic with

7   this.  I guess the difference is that if your primary

8   obligation is a civil judgment versus your primary obligation

9   being a criminal restitution obligation, one big difference is

10  that in the United States, we don't throw people in prison for

11  failing to pay civil judgments.  If you willfully fail to pay

12  restitution, we will return you to custody.

13          MR. ROTERT:  Well -- and, see, to me, if I may,

14  Judge, that's the benefit of the proposal that I have set forth

15  in court.  Because if you make it a condition of supervised

16  release that he make payments toward his civil restitution

17  obligations and he doesn't, it's not a matter of enforcing a

18  civil judgment.  It is a supervised release condition.  It's

19  like he came up with a gun and some cocaine or something.  You

20  could put him in jail.

21          THE COURT:  I am going to ask, then, that Ms. Perry

22  investigate how exactly we do this, because, again, I am

23  sympathetic to your position.  I really want it to be very

24  clear that his payment on the civil judgment -- if he were to

25  pay this entire civil judgment, obviously he owes nothing with

1    respect to restitution in this case, far less than nothing.

2              MR. ROTERT:  Judge, thank you.  And, I mean, I'm

3    going to await Ms. Perry's report, but I'm going to continue,

4    I'm sure, to adhere to the view that I was --

5              THE COURT:  The position you are taking?

6              MR. ROTERT:  Yes.

7              THE COURT:  Yes.  It is a reasonable one.

8              Are there any recommendations that the defendant

9    would request with respect to custody?

10             MR. ROTERT:  There are, Your Honor.  And if I may,

11   I'm 99 percent sure that we have taken care of the special

12   assessment, but I'll confirm that.

13             THE COURT:  A $500 special assessment, I have

14   mentioned that, but that's --

15             MR. ROTERT:  But I think we --

16             THE COURT:  Oh, you believe it's been paid?

17             MR. ROTERT:  -- took care of that at the plea.

18             THE COURT:  All right.

19             MR. ROTERT:  I will verify that, Your Honor.

20             THE COURT:  You can double-check, yes.

21             MR. ROTERT:  As far as the confinement circumstances,

22   Your Honor, as the Court's well aware, Mr. Demasi's family

23   support is centered in Michigan.  I hope that he'll be

24   considered for placement in that area.

25             Also, Your Honor, under the circumstances,

1    particularly in light of the materials that we sent from the

2    two physicians, I'd like to ask -- and I know the Court has no

3    ability to control the BOP, but I'd be grateful if the Court

4    would recommend that Mr. Demasi be placed in a program that the

5    BOP operates that provides substance abuse and counseling so

6    that we can look forward to at least making those helpful

7    improvements.

8            THE COURT:  I will make that recommendation.

9            MS. PERRY:  Do you want to set us over for a week or

10   two, Judge?

11           THE COURT:  Sure.

12           MS. RAY:  Your Honor, I don't believe there was a

13   term of supervised release set.

14           THE COURT:  You are right, and we will make it -- I

15   believe I meant to say five years, but -- no.  I'm sorry.

16   Three years, three years' supervised release.

17           I need to let Mr. Demasi know about his appeal

18   rights, so I will do that now.

19           Mr. Demasi, you are entitled to take an appeal from

20   my sentence.  If you are unable to file a notice of appeal on

21   your own, the court Clerk will do that at your request.  You

22   need to file your notice of appeal within 14 days.

23           THE COURT REPORTER:  The probation officer's name?

24           THE COURT:  Can I ask you for your appearance?  I'm

25   sorry.

1        MS. RAY:  Melissa Ray on behalf of Probation.

2        THE COURT:  Thanks.

3        MS. RAY:  Thank you.

4        MS. PERRY:  Do you want us all to come back to

5    discuss the restitution?

6        THE COURT:  I don't think that's necessary.  I don't

7    think that's necessary.  If you could -- as long as you reach

8    an agreement.  If not -- why don't we set it for noon next

9    Friday in case you are unable to agree.  Is that all right?

10   Not a good day?

11       MR. ROTERT:  That Friday is a tough one for me,

12   Judge.

13       THE COURT:  How about Thursday?  Is that too soon?

14       MR. ROTERT:  I think Thursday would work.

15       MS. PERRY:  Thursday should be fine.

16       THE COURT:  Okay.  Thursday, the 8th, then, at noon.

17       For the people in the courtroom that love Mr. Demasi,

18   I don't expect you to feel good about this.  I can't even

19   imagine how painful it must be, and I just want you to know

20   that I don't make these decisions easily or lightly.  And I

21   know that when I pronounce judgment on somebody, that it has a

22   ripple effect on all kinds of lives, and that it's very

23   profound and painful, and I just want you to know I'm sensitive

24   to that.

25       Thank you.

1          MS. PERRY:  Thank you, Judge.

2          MR. ROTERT:  Thank you, Your Honor.

3      (Pause.)

4          THE COURT:  I am reminded that I neglected to set a

5  surrender date.  I apologize.

6          What I would suggest here would be right after Labor

7  Day.  So September 1st?  No.  September 7th?

8          MR. ROTERT:  September 7th is fine, Your Honor.

9          THE COURT:  We'll say noon.

10          MR. ROTERT:  Can the record reflect that conditions

11  of bond continue until the surrender date?

12          THE COURT:  Any objection?

13          MS. PERRY:  No, Judge.

14          THE COURT:  So ordered.

15          MR. ROTERT:  Thank you, Judge.

16          MS. PERRY:  Thank you.

17      (Proceedings concluded.)

18

19

20

21

22

23

24

25

1            C E R T I F I C A T E
2
3
4
5              I, Colleen M. Conway, do hereby certify that the
6     foregoing is a complete, true, and accurate transcript of the
7     Sentencing proceedings had in the above-entitled case before
8     the HONORABLE REBECCA R. PALLMEYER, one of the Judges of said
9     Court, at Chicago, Illinois, on July 2, 2010.
10
11
12        _/s/ Colleen M. Conway, CSR,RMR,CRR_        _08/05/10_
13             Official Court Reporter              Date
              United States District Court
14            Northern District of Illinois
                  Eastern Division
15
16
17
18
19
20
21
22
23
24
25